**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2416-17T3

AMERESTATE HOLDINGS, LLC,
BROADWAY WEST, LLC and
811 ASSOCIATES, LLC,

    Plaintiffs-Appellants,

v.

CBRE, INC., CHARLES BERGER,
ELLI KLAPPER, BACA REAL ESTATE
INVESTMENT CORP., 1064 REALTY
CORP., WESLEY REALTY CORP.,
B'WAY REALTY CORP., DRESDNER
ROBIN ENVIRONMENTAL MANAGEMENT,
INC., and EDWARD V. KOLLING,

    Defendants-Respondents,

and

GRID REAL ESTATE, LLC,
GRID COMMERCIAL REAL ESTATE,
LLC, and ROBERT ANTONICELLO,

    Defendants.

_____

DRESDNER ROBIN ENVIRONMENTAL
MANAGEMENT, INC. and EDWARD
V. KOLLING,

    Third-Party Plaintiffs,

v.

FEINSTEIN, RAISS, KELIN &
BOOKER, LLC, and RICHARD S.
KLEIN, ESQ.,

Third-Party Defendants.

_____

Argued April 30, 2018 — Decided September 4, 2018

Before Judges Accurso, O'Connor and Vernoia.

On appeal from Superior Court of New Jersey,
Law Division, Hudson County, Docket No. L-
3012-15.

John R. Wenzke argued the cause for appellants
(Lasser Hochman, LLC, attorneys; John R.
Wenzke, of counsel and on the brief).

Kenneth L. Moskowitz argued the cause for
respondents CBRE, Inc., Charles Berger and
Elli Klapper (Brown Moskowitz & Kallen, PC,
attorneys; Kenneth L. Moskowitz and Steven R.
Rowland, of counsel and on the brief).

Charles F. Kellett argued the cause for
respondents Dresdner Robin Environmental
Management, Inc. and Edward V. Kolling
(Kaufman Dolowich & Voluck, LLP, attorneys;
Gino Zonghetti, of counsel and on the brief;
Charles F. Kellett, on the brief).

The Aboushi Law Firm, attorneys for
respondents Baca Real Estate Investment Corp.,
1064 Realty Corp., Wesley Realty Corp., and
B'Way Realty Corp., join in the briefs of
respondents CBRE, Inc. and Dresdner Robin
Environmental Management, Inc.

PER CURIAM

By leave granted, plaintiffs Amerestate Holdings, LLC,

Broadway West, LLC and 811 Associates, LLC, (collectively referred

to as "plaintiffs") appeal from orders requiring disclosure of certain attorney-client communications related to Amerestate's February 5, 2015 purchase of a Jersey City real estate development site. Because we are convinced the motion court correctly determined plaintiffs waived the attorney-client privilege with regard to the limited communications that are the subject of the court's orders, we affirm with the modification that only communications occurring prior to the February 5, 2015 purchase shall be disclosed.

I.

A. The Complaint

We first summarize the allegations in plaintiffs' amended complaint[1] because they provide context for the dispute leading to the orders challenged on appeal. Plaintiffs allege that in 2014 Amerestate's managing member, Jacob Salamon, received an email from defendant Charles Berger, a vice president and real estate agent at defendant CBRE, Inc., concerning a Jersey City real estate development site being offered for sale by defendants Baca Real Estate Investment Corp., 1064 Realty Corp., Wesley Realty Corp. and B'Way Realty Corp. (collectively referred to as the "seller defendants"). According to the complaint, Salamon thereafter

---

[1] The operative complaint is the June 6, 2016 amended complaint. The original complaint was filed in July 2015.

received a prospectus prepared by CBRE representing that the site consisted of seven adjoining lots comprised of 3.91 acres totaling 170,479 square feet, and the development could consist of approximately 580 as-of-right apartment units.

The complaint alleges that in addition to Berger and CBRE, defendants Grid Real Estate, LLC, its president, defendant Robert Antonicello, and CBRE vice president Elli Klapper acted as the seller defendants' agents, and were responsible for the representations in the prospectus. Plaintiffs claim representations concerning the number of as-of-right units were material to the decision to purchase the site because as-of-right units could be constructed without obtaining zoning approvals and other variances. Plaintiffs further allege CBRE, Berger and Klapper knew the right to construct that number of units was material to the purchase decision.

Based on CBRE's representations concerning the acreage and number of as-of-right units, in June 2014, plaintiffs submitted a $19.5 million offer to purchase the site, and requested that Berger and CBRE confirm that "approximately 580 as-of-right units could be built on the . . . site." Berger later advised Amerestate that CBRE had retained a professional planner, defendant Edward V. Kolling, who was the director of planning services at defendant Dresdner Robin Environmental Management, Inc., (Dresdner Robin),

4

and that Kolling confirmed approximately 565 as-of-right units could be constructed on the site.

As negotiations for the purchase contract continued, plaintiffs required confirmation from Berger and CBRE that they would be able to build 565 as-of-right units on the site. The complaint alleges the confirmation was required because the purchase agreement would not provide for due diligence or physical inspection of the property, other than for environmental issues.

In August 2014, Berger sent Amerestate an analysis from Dresdner Robin representing that 567 as-of-right units could be built on the site, and explaining its methodology for the calculation. According to the complaint, in direct reliance on the representations concerning the as-of-right units, Amerestate entered into an Agreement of Purchase and Sale for the site on September 3, 2014. The closing of title took place almost five months later on February 5, 2015, for the agreed-upon $19.5 million sale price.

It was not until after the closing that Amerestate obtained a survey of the consolidated seven lots and learned for the first time that the site consisted of only 146,085 square feet, or 3.35365 acres, and, as a result, only permitted construction of 486 as-of-right apartment units. Plaintiffs allege they then learned that prior to CBRE's distribution of the prospectus and

the subsequent negotiations surrounding Amerestate's execution of the purchase agreement, CBRE, Grid, Berger, Klapper and Antonicello (collectively referred to as the "broker defendants") met with representatives from the Jersey City Planning Staff and were advised the site permitted "no greater than 510 as-of-right units." Plaintiffs allege the broker defendants failed to disclose this information.

Plaintiffs further claim Kolling advised the broker defendants in May 2014 that the number of as-of-right units might be no greater than 498, but that information was never conveyed to plaintiffs. In addition, plaintiffs aver that in August 2014, at the broker defendants' request, Dresdner Robin and Kolling deleted a discussion of its calculation of the 498 as-of-right units from a letter it prepared, knowing CBRE would provide the revised letter to plaintiffs without disclosure of the calculation.

The causes of action asserted in the complaint are founded on the claim that defendants purposefully or negligently misrepresented the site's size and number of as-of-right apartment units. Plaintiffs claim they relied on these misrepresentations and assert causes of action for legal fraud, negligent misrepresentation, breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, civil conspiracy,

professional malpractice and reformation of contract. Defendants filed answers to the complaint denying plaintiffs' claims.

B. Plaintiffs' Assertion of the Attorney-Client Privilege

During discovery, plaintiffs objected to defendants' requests for information and documents, and deposition questions that required disclosure of attorney-client communications related to their alleged reliance on misrepresentations as to the site's size and the number of as-of-right units. Plaintiffs asserted the communications constituted privileged attorney-client communications. See N.J.R.E. 504. Defendants argued plaintiffs waived the attorney-client privilege with regard to the communications by putting in issue its purported reliance on the alleged misrepresentations.

Defendants asserted the communications related to an issue raised by plaintiffs in their complaint — whether they reasonably relied on the alleged misrepresentations concerning the site's size and the number of as-of-right units in making their decision to purchase and close title on the site. Defendants also claimed plaintiffs waived the attorney-client privilege by otherwise disclosing attorney-client communications to third parties.

C. The Motions to Compel Disclosure

CBRE, Berger and Klapper and Dresdner Robin and Kolling separately moved for orders compelling plaintiffs to disclose

A-2416-17T3

attorney-client communications related to their alleged reasonable reliance on the alleged misrepresentations. In May 2017, the court entered orders denying the motions, finding that under our Supreme Court's decision in State v. Mauti, 208 N.J. 519 (2012), the attorney-client privilege could not be pierced because there were no "constitutional rights . . . at stake."

CBRE, Berger and Klapper and Dresdner Robin and Kolling moved for reconsideration, arguing the motion court erred in its application of Mauti. They claimed the Court in Mauti expressly recognized the attorney-client privilege is subject to explicit and implicit waivers, and that plaintiffs implicitly waived the privilege by placing in issue their attorney-client communications concerning the size of the site, the number of as-of-right units and their due diligence in considering those issues by asserting they reasonably relied on the alleged misrepresentations. They also claimed plaintiffs expressly waived the privilege by disclosing attorney-client privileged communications to third parties.

After hearing argument, the court determined plaintiffs had placed in issue the communications with their counsel concerning the site's size, the as-of-right units and plaintiffs' due diligence by asserting they reasonably relied on the broker defendants' alleged misrepresentations. The court also determined

plaintiffs waived the privilege by disclosing to third parties certain communications with its counsel. The motion court expressed concern about the scope of the permitted discovery, noting it was incorrect to assume all communications between plaintiffs and their counsel should be disclosed.

The court explained that the inquiries in those limited areas should "be narrowly tailored," and its orders requiring disclosure of the communications covered both questions posed during depositions as well as requests for documents. The court further advised that it would immediately review any objections to any questions posed during depositions, and would review in camera any documents, where objections based on the attorney-client privilege were interposed.

D. The October 27, 2017 Orders Directing Disclosure

The court entered an October 27, 2017 order granting CBRE's motion, and directing that plaintiffs, and their counsel and agents, disclose communications concerning "all matters that plaintiff[s] [have] put in [] issue concerning the subject matter of the size/acreage and development potential of the . . . [s]ite, and communications and advice concerning diligence and investigation that had been or should be conducted to assess the development potential of the [s]ite . . . ." The court's order

limited the disclosure to six defined topics related to the investigation and negotiation of the as-of-right units.[2]

[2] The court ordered disclosure of communications concerning:

> (i) . . . the advisability and/or consequences of submitting offers that waived the right to terminate the transaction in the event that the minimum number of "as-of-right" units could not be confirmed by Amerestate in conducting its diligence;
>
> (ii) . . . the need, advisability and/or possibility of negotiating for the inclusion in the Purchase Agreement of representations and/or warranties concerning the area of the consolidated [site] and/or the number of units that could . . . constructed on the Site;
>
> (iii) . . . the need, advisability and/or possibility of negotiating or renegotiating the right to terminate the . . . [agreement] in the event that the minimum number of "as-of-right" units could not be confirmed by Amerestate in conducting its diligence;
>
> (iv) . . . the need, advisability and/or possibility of negotiation or renegotiating a provision making the purchase contingent on the Jersey City Planning Board approval of a minimum number of as-of-right units and/or making the purchase price dependent on the number of units ultimately approved by the Planning Board;
>
> (v) . . . the need and/or advisability of obtaining an updated survey so that the area of the consolidated Site could be verified and, derivatively, Amerestate could obtain an accurate projection of the number of "as-of-right" units from its architect; and

A-2416-17T3

The court entered a separate October 27, 2017 order granting Dresdner Robin and Kolling's motion, and ordering that plaintiffs and their counsel disclose communications and information exchanged related to the "size/acreage and development potential of the property at issue . . . [and] regarding steps and measures to be taken by [p]laintiff[s] to evaluate the . . . transaction."

E. Plaintiffs' Motion for Clarification or Reconsideration

Plaintiffs subsequently moved for clarification or reconsideration of the court's October 27, 2017 orders permitting discovery of the attorney-client communications. CBRE filed a motion to enforce the orders.

In its January 10, 2018 decision on the motions, the court noted that plaintiffs sought a temporal limitation on the communications covered by the court's October 27, 2017 orders. The court recognized the orders did not include "a temporal limitation on the permitted disclosure," and that CBRE and Dresdner Robin argued "at the very least" plaintiffs put at issue its attorney-client communications in substantive areas covered by the court's orders "at the very least as of the date of the closing

---

(vi) . . . the need to obtain an independent projection concerning the number of "as-of-right" units that potentially could be constructed on the Site including, without limitation, the review of existing surveys and deeds . . . .

11

of its purchase of the . . . site on February 5, 2015, if not through the date that . . . plaintiff[s] commenced this action." The court then discussed the disclosures it ordered on October 27, 2017, and stated they "shall include the time period through the date of the closing of the transaction as of February 5, 2015."

The court, however, further stated that plaintiffs and their counsel shall produce documents and electronically stored data, and answer deposition questions, concerning attorney-client communications occurring "prior to the commencement of this action" concerning the matters plaintiffs "has placed in issue as set forth in the [court's] prior orders . . . ."

The court entered a January 10, 2018 order denying plaintiffs' motion, but directed that "defendants are permitted to make inquiry into attorney[-]client communications" limited to "the period prior to September 3, 2014," concerning three issues: 1. communications "regarding the site's projected unit count"; 2. "the advice that . . . plaintiff[s] received from counsel concerning the diligence necessary to make an accurate projection of [the] unit count; and 3. "the contractual protections necessary to manage the risks related to the unit count."

The court entered a separate January 10, 2018 order granting CBRE's motion, and directing that plaintiffs and their counsel disclose communications "exchanged between Amerestate and its

attorneys prior to the commencement of this action which pertain to those matters that Amerestate itself has put 'in-issue' as set forth in"  the court's October 27, 2017 orders.

We subsequently granted plaintiffs' motion for leave to appeal the court's October 27, 2017 and January 10, 2018 orders.

Plaintiffs present the following arguments for our consideration:

POINT I

THE TRIAL COURT PROPERLY APPLIED MAUTI IN ITS MAY 26, 2017 DECISION AND FOUND NO IMPLICIT OR EXPLICIT WAIVER AND THEN ERRED IN ITS OCTOBER 27, 2017 AND JANUARY 10, 2018 RECONSIDERATION CONCLUSIONS THAT CERTAIN EMAILS TO THIRD PARTIES SOMEHOW CONSTITUTED A WAIVER ALLOWING FOR AN EXTENSIVE AND OVERBROAD PIERCING OF THE PRIVILEGE.

A. The Standard Of Appellate Review Is De Novo.

B. The Attorney Client Privilege.

C. The May 26, 2017 Trial Court Decision Properly Rejected The Defendants' "Legitimate Need" Arguments And Their Effort To Apply The Kozlov Three-Part Balancing Test And Instead Properly Applied The Holding In Mauti.

D. For An Implied Waiver To Be Found The Law Requires That The Defendants Establish That Plaintiffs Put a "Communication" With Their Attorneys "At Issue" By Attempting To Use The Communication As A Sword And the Privilege As A Shield.

    1. The Plaintiffs Must Put A Privileged Communication At Issue In The Litigation In

13

Order To Begin The Implied [W]aiver Analysis — the Mere Assertion Of A Claim Is Insufficient.

2. There Are Different Tests Applied To A Piercing Of A Privilege And An Implicit Waiver Of A Privilege And the Implied Waiver Test Requires The Use Of A Privileged Communication As a Sword And The Privilege As a Shield.

3. The Case Law Finding An Implicit Waiver Relied Upon By Defendants Requires The Use Of A Privileged Communication As a Sword [A]nd The Privilege As a Shield.

E. The Trial Court Erred In Its Reconsideration Decisions And Piercing Orders Because The Documents Relied Upon To Conclude That The Privilege Was Waived Either Do Not Disclose Attorney Client Communications, Were After The Contract Was Executed Or Are Not Related To the Areas That The Court Permitted The Privilege To Be Pierced.

F. The Very Relief Granted By The Piercing Orders Demonstrates That The Purpose Of Defendants Inquiry Is Unrelated To An Otherwise Privileged Communication Put At Issue And, Instead, Is Related To The Improper Purpose Of Fishing To Prove That Plaintiffs Did Not Take Advise Of Their Attorneys Which, As A Matter Of Law, Is A Baseless Defense.

II.

"[W]e 'normally defer to a trial court's disposition of discovery matters . . . unless the court has abused its discretion[,]' or the decision is based on 'a mistaken understanding of the applicable law.'" Hedden v. Kean Univ., 434 N.J. Super. 1, 10 (App. Div. 2013) (alteration in original). Here,

we review the court's determination concerning the application and waiver of the attorney-client privilege de novo, "[b]ecause '[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.'" Ibid. (quoting Manalapan Realty, LP v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995)).

N.J.S.A. 2A:84A-20, which is codified in N.J.R.E. 504, sets forth the parameters of the attorney-client privilege, providing in part that "communications between [a] lawyer and his [or her] client in the course of that relationship and in professional confidence, are privileged . . . ." The attorney-client privilege "rests on the need to 'encourage full and frank communications between attorneys and their clients,'" Hedden, 434 N.J. Super. at 10 (quoting United Jersey Bank v. Wolosoff, 196 N.J. Super. 553, 561 (App. Div. 1984)), "[p]reserv[es] the sanctity of confidentiality of a client's disclosures to his [or her] attorney," ibid. (quoting United Jersey Bank, 196 N.J. Super. at 561), and "constitutes an indispensable ingredient of our legal system," id. at 11 (quoting In re Grand Jury Subpoenas Duces Tecum, 241 N.J. Super. 18, 27-28 (App. Div. 1989)). "[T]here is a presumption that a communication made in a lawyer-client relationship has been made in professional confidence[,]" and where "applicable, '[the privilege] must be given as broad a scope

as its rationale requires.'" Id. at 12 (quoting United Jersey Bank, 196 N.J. Super. at 561).

"[T]he attorney-client privilege is 'clearly extremely important,' [but] it is neither absolute nor sacrosanct." Id. at 11-12 (quoting Biunno, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 504(3) (2013)). "[P]rivileges stand in what we have declared to be a 'disfavored status' because they have an effect on the truth-seeking function." Mauti, 208 N.J. at 531 (quoting Payton v. N.J. Tpk. Auth., 148 N.J. 524, 539 (1997)). Thus, "we construe testimonial privileges narrowly because they prevent the trier of fact from hearing relevant evidence and thereby undermine the search for truth[,] . . . [and] sensibly accommodate privileges to the aim of a just result, and accept them to the extent they outweigh the public interest in full disclosure." Id. at 531-32 (quoting State v. J.G., 201 N.J. 369, 383 (2010)).

Where a privilege applies, it may be pierced in certain limited circumstances. Our Supreme Court established a three-part standard that must be satisfied by a party seeking to pierce a privilege: (1) there must be "a legitimate need . . . to reach the evidence sought to be shielded"; (2) the evidence must be relevant and material to an issue in the case; and (3) there must be a finding, "by a fair preponderance of the evidence," that the information sought cannot be obtained from a "less intrusive

16

source." In re Kozlov, 79 N.J. 232, 243-44 (1979) (quoting In re Farber, 78 N.J. 259, 276-77 (1978)).

In Mauti, the Court "severely curtailed" application of the Kozlov standard. Hedden, 434 N.J. Super. at 17. The Court explained,

> Kozlov did not propound a broad equitable balancing test pursuant to which any privilege is subject to piercing if the adversary "needs" relevant evidence that cannot be obtained from another source. Such an approach would eviscerate the privileges and trench on the legislative judgments informing them. To the contrary, in Kozlov, . . . we recognized that only in the most narrow of circumstances, such as where a privilege is in conflict with a defendant's right to a constitutionally guaranteed fair trial, would the need prong of its test be satisfied.
>
> [Mauti, 208 N.J. at 537-38.]

The Court added that, in the context of a statutory privilege, "the privilege could not be overborne, except where specifically so provided by the Legislature or where the need arose out of a constitutionally based command." Id. at 538.

The Court, however, also recognized that "any party is free to waive a privilege." Id. at 532. Under N.J.R.E. 530, a privilege may be explicitly waived by contract, or by making or consenting to disclosure of privileged communications, "without coercion and with knowledge of [the client's] right or privilege." Ibid. (quoting N.J.R.E. 530). "[O]ur courts have also recognized that

a privilege may be waived 'implicitly' where a party puts a confidential communication 'in issue' in a litigation." Ibid. (quoting Kinsella v. Kinsella, 150 N.J. 276, 300 (1997)).

Here, the court ordered disclosure of plaintiffs' communications with their counsel based on its determination plaintiffs implicitly waived the privilege by placing the communications in issue. The court also relied on plaintiffs' explicit waiver of the privilege by their disclosure of certain communications with their counsel related to the purchase and development of the site. We first address the court's determination that plaintiffs implicitly waived the privilege by placing communications with their counsel in issue.

A.

In Mauti, the Court provided examples of circumstances where it was determined that a party implicitly waived a privilege by putting confidential communications in issue. Ibid. The Court cited Arena v. Saphier, 201 N.J. Super. 79, 90 (App. Div. 1985), where we determined a plaintiff claiming emotional distress damages in a malpractice action waived the psychologist-patient privilege, N.J.S.A. 45:14B-28 and N.J.R.E. 505, as to her communications with her treating psychologist. Ibid.; Saphier, 201 N.J. Super. at 90. There, we recognized the privilege's purpose was to facilitate the free flow of information between a

18

patient seeking treatment and his or her psychologist, but determined that "a patient should not be permitted to establish a claim while simultaneously foreclosing inquiry into relevant matters," and ordered limited disclosure of communications between the plaintiff and her psychologist to the extent they pertained to the issue in the malpractice case — "her present mental and emotional condition." Saphier, 201 N.J. Super. at 89-90.

The Court also cited Blitz v. 970 Realty Assoc., 233 N.J. Super. 29 (App. Div. 1989), as a further example of an implicit waiver of a privilege by a party's placing privileged communications in issue. Mauti, 208 N.J. at 532. In Blitz, the plaintiff alleged the defendants fraudulently induced her into signing a real estate purchase contract by misrepresenting the environmental conditions and clean-up costs for the property. 233 N.J. Super. at 30-31. The defendants sought disclosure of the plaintiff's communications with her counsel concerning the environmental issues that occurred prior to her execution of the purchase contract. Id. at 31.

Like plaintiffs here, the plaintiff in Blitz asserted a cause of action for legal fraud, which requires proof establishing the essential element of reasonable reliance. Id. at 36. We observed that

> [a]lthough '[o]ne who engages in fraud . . . may not urge that one's victim should have been more circumspect or astute,    . . . 'if a party to whom representations are made nevertheless chooses to investigate the relevant state of facts for himself, he will be deemed to have relied on his own investigation and will be charged with knowledge of whatever he could have discovered by a reasonable investigation.'
>
> [Id. at 36-37 (second and third alterations in original) (citations omitted)].

We concluded the motion court correctly determined the plaintiff waived the attorney-client privilege as to her communications with her counsel prior to entering into the contract because she "placed in issue what she knew prior to" executing the contract.  Id. at 37.  We also determined that the plaintiff did not waive the privilege with regard to her post-contract communications with her attorney because any information obtained following her entry into the contract was "irrelevant to the reliance issue."  Ibid.

Lastly, in Mauti the Court cited Wolosoff, 196 N.J. Super. at 564-65, as a further example of an implicit waiver of the attorney-client privilege.  208 N.J. at 532.  In Wolosoff, the plaintiff sought rescission of a settlement agreement based on a claim the defendant made misrepresentations during settlement negotiations.  196 N.J. Super. at 558-59.  The defendant sought access to communications between the plaintiff and its attorneys

20

to challenge the plaintiff's claim it relied on the defendant's alleged misrepresentations. Id. at 559-60. Noting that permitting the plaintiff to rely on the privilege would inequitably allow the plaintiff to "divulge whatever information is favorable to its position and assert the privilege to preclude disclosure of . . . detrimental facts," we concluded that "when confidential communications are made a material issue in a judicial proceeding, fairness demands waiver of the privilege," ibid. (quoting United States v. Mierzwicki, 500 F. Supp. 1331, 1335 (D. Md. 1980)).

Relying on Arena, Blitz and Wolosoff, the Court in Mauti concluded that "in each of those circumstances, the party who places a confidential communication in issue voluntarily creates the 'need' for disclosure of those confidences to the adversary." 208 N.J. at 532. Measured against that standard, we are convinced the motion court correctly determined plaintiffs' communications pertaining to the as-of-right units, size of the site and any due diligence or investigation concerning those matters were placed in issue by plaintiffs' allegation they reasonably relied on the alleged misrepresentations. See Weingarten v. Weingarten, 234 N.J. Super. 318, 327 (App. Div. 1989) (finding that by claiming she reasonably relied on the defendant's representations in entering into a settlement agreement, the plaintiff waived the attorney-client privilege regarding communications related to the

settlement negotiations because the defendant was "entitled to explore the existence of such evidence as may enable him to demonstrate" that the plaintiff did not actually rely on his representations). Indeed, the fulcrum upon which the validity of plaintiffs' causes of action pivots is their assertion that Amerestate entered into the purchase agreement in September 2014, and proceeded to close title and purchase the property on February 5, 2015, based on its reasonable reliance on the broker defendants' representations concerning the site's size and the number of as-of-right units. See, e.g., Blitz, 233 N.J. Super. at 36 (noting that reasonable reliance on an alleged false representation is an essential element of a cause of action for legal or equitable fraud); Kaufman v. i-Stat Corp., 165 N.J. 94, 109 (2000) (explaining the cause of action for negligent misrepresentation also requires proof of reasonable reliance).

Moreover, Amerestate represented in the September 2014 purchase agreement that it agreed to purchase the site

> in its existing condition AS IS, WHERE IS, AND WITH ALL FAULTS with respect to all facts, circumstances, conditions and defects, and, Seller has no obligation to determine or correct any such facts, circumstances, conditions or defects or to compensate [Amerestate] for same. [Amerestate] is and will be relying strictly and solely upon such inspections and examinations and the advice

and counsel of its own consultants, agents, counsel and officers.

[(emphasis added).]

Thus, Amerestate also placed in issue its reliance on its counsel's advice concerning the "facts" and "circumstances" regarding the site, including its size and the number of as-of-right units, by affirmatively representing in the purchase agreement that it relied solely upon its counsel and other consultants and agents, and not on any of the broker defendants' advice, when it agreed to purchase the property.

Like the plaintiff in Blitz, plaintiffs placed in issue what they "knew" about the site size and the as-of-right units. 233 N.J. Super. at 37. Under the circumstances presented here, however, their relevant knowledge and communications with counsel are not limited to those extant when the purchase agreement was signed. Plaintiffs' complaint expressly alleges they relied on the purported misrepresentations when Amerestate executed the purchase agreement on September 3, 2014, and also when Amerestate closed title on February 5, 2015. We are therefore convinced plaintiffs implicitly waived the attorney-client privilege as to all communications with their counsel prior to the closing of title pertaining to the site's size, the number of as-of-right units and plaintiffs' due diligence in investigating and assessing

23

that information. Plaintiffs could not have relied on attorney-client communications subsequent to the closing of title in making the decision to purchase the site and, for that reason, plaintiffs have not placed those communications in issue. See ibid. As the motion court correctly observed, denying defendants the opportunity to "probe [the] information" would be to "fundamentally deprive [defendants] of the ability to defend [themselves] against these charges properly."

We therefore affirm the court's October 27, 2017 and January 10, 2018 orders but, for the reasons stated, modify the orders to require disclosure only of the designated attorney-client communications which occurred prior to the February 5, 2015 closing.

### B.

Plaintiffs further argue the court erred by finding they expressly waived the attorney-client privilege through their disclosure of otherwise privileged communications. More particularly, they contend the court erroneously concluded that plaintiffs expressly waived the privilege based on six separate emails, four of which were sent by plaintiffs' counsel and two of which were sent by Salamon.

We first note that our determination the court correctly concluded plaintiffs implicitly waived the attorney-client

24

privilege renders it unnecessary to address the court's alternative basis for compelling disclosure of the communications — plaintiffs' purported explicit waiver of the privilege. That is, even if the motion court erred in finding plaintiffs explicitly waived the privilege, plaintiffs' implicit waiver of the privilege requires disclosure of the communications encompassed by the court's orders for the time period up to the February 5, 2015 closing of title. For purposes of completeness, however, we nevertheless address the court's determination that plaintiffs explicitly waived the attorney-client privilege.

A party expressly waives the attorney-client privilege by making "disclosure of any part of the privileged matter or consented to such a disclosure made by anyone." N.J.R.E. 530. "Generally, once privileged material is disclosed, the privilege of non-disclosure is waived as to that matter." Hedden, 434 N.J. Super. at 15. "The waiver of the attorney-client privilege[,]" however, "rests solely with the client." In re Grand Jury Subpoena Issued to Galasso, 389 N.J. Super. 281, 298 (App. Div. 2006).

As noted, the motion court found an explicit waiver of the attorney-client privilege based in part on four emails sent from plaintiffs' counsel and two emails sent by Salamon. The court first determined plaintiffs expressly waived the attorney-client privilege when their counsel handling the purchase transaction

sent an August 11, 2014 email to Salamon expressing his concern about the legal description of the site in the deed. Counsel sent a copy of the email to Klapper and Berger and, thus, defendants claim and the court determined Amerestate waived the attorney-client privilege with respect to all communications between plaintiffs and their counsel regarding the site size, as-of-right units, and plaintiffs' exercise of due diligence and reliance on the broker defendants' alleged misrepresentations.

The email says little more than counsel has a concern regarding the legal description in the deed and that he would address the issue when he returned from vacation. The email does not disclose any privileged communications between Salamon and Amerestate's transaction counsel concerning the site size, as-of-right units or plaintiffs' due diligence and therefore does not constitute a waiver of the attorney-client communications as to those matters. See In re Grand Jury Subpoena, 389 N.J. Super. at 298 (noting that when attorney-client privileged communications are disclosed there is a waiver of the privilege with respect to "information pertaining to the same subject matter"). Moreover, since only plaintiffs could waive the privilege by disclosing the communications, and the record is devoid of any evidence plaintiffs authorized their counsel to waive their privilege, any disclosure made by their counsel was insufficient to constitute a waiver of

the privilege by plaintiffs. See Hedden, 434 N.J. Super. at 15 (finding that only the client can authorize disclosure of privileged information and therefore waive the attorney-client privilege). The court erred by finding otherwise.

Similarly, the court erred by finding a November 4, 2014 email from Amerestate's transaction counsel to a title officer, that sought clarification concerning the existence of easements on the site, constituted a waiver of the attorney-client privilege. The email did not constitute an express waiver of the privilege because it contains no attorney-client communications.

We are also convinced the court erred by finding a February 3, 2015 email from Amerestate's transaction counsel to Amerestate's representatives describing an attached deed and detailing suggested corrections supported its determination that plaintiffs expressly waived the attorney-client privilege concerning the site's size, the as-of-right units and plaintiffs' due diligence. Defendants claimed, and the court found, plaintiffs expressly waived the attorney-client privilege because a copy of the email was also sent to a third-party title officer. Again, the email was not sent by plaintiffs and the record is bereft of any evidence their counsel was authorized to waive the privilege on their behalf. Thus, there is no basis to conclude counsel's

disclosure of his communication with his clients constituted an explicit waiver of the privilege by plaintiffs.

The record also does not support the court's conclusion a September 15, 2015 email from plaintiffs' counsel to Salamon and third-party architects about the necessity of a variance constituted a waiver of the privilege. There is no evidence plaintiffs authorized the counsel's disclosure to the third party and, thus, no basis to conclude the disclosure constituted an express waiver of the privilege by plaintiffs. See ibid.

The motion court, however, correctly determined that two emails sent by Salamon constituted an explicit waiver of the attorney-client privilege. The record shows Salamon was plaintiffs' authorized representative for purposes of consulting with their counsel, and therefore his communications with counsel on plaintiffs' behalf were protected by the attorney-client privilege. See Hedden, 434 N.J. Super. at 11 (citing Upjohn Co. v. United States, 449 U.S. 383, 391 (1981)). It therefore follows that Salamon, acting as plaintiffs' authorized representative, possessed the capacity to waive the attorney-client privilege on plaintiffs' behalf. Id. at 17.

In a September 7, 2014 email, Salamon disclosed to a third-party potential investor attorney-client communications concerning the number of units at the site and counsel's strategy to increase

28

the unit total. Similarly, in a November 4, 2014 email, Salamon informed third-parties about counsel's advice concerning the unit count and square footage of the site plan design. In his emails, Salamon voluntarily disclosed on plaintiffs' behalf otherwise privileged attorney-client communications to third parties. We are therefore satisfied Salamon's emails constituted an explicit waiver of the privilege by plaintiff that in part further support the court's disclosure orders.

Affirmed as modified.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2416-17T3